UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOLORES SANDOVAL,<br><br>                              Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>                              Defendant. | Case No.: 19-CV-1477-WVG<br><br>**ORDER GRANTING-IN-PART<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND<br>DENYING-IN-PART DEFENDANT'S<br>CROSS-MOTION FOR SUMMARY<br>JUDGMENT**<br><br>**[Doc. Nos. 16, 17.]** |

This is an action for judicial review of a decision by the Commissioner of Social Security, Andrew Saul, denying Plaintiff Dolores Sandoval Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for summary judgment. For the reasons stated below, the Court GRANTS-IN-PART Plaintiff's motion for summary judgment and DENIES-IN-PART Defendant's cross-motion for summary judgment. The Court orders that the matter be remanded for further administrative proceedings.

/ / /

/ / /

/ / /

# I.   OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Social Security Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

## A.   The SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must show that (1) he or she suffers from a medically-determinable impairment[1] that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

A claimant must meet both of these requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving that he or she was "either permanently disabled or subject to a condition which became so severe as to disable [him or] her prior to the date upon which [his or] her disability insured status expires." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds that

---

[1] A medically-determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

19-CV-1477-WVG

a claimant is disabled or not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny a claimant disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to ascertain whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find that a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

If the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* § 404.1520(d).

If the ALJ does not deem a claimant disabled—but before formally proceeding to step four—the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must assess relevant medical and other evidence, as well as consider all of the claimant's

impairments, including impairments categorized as non-severe. *Id.* § 404.1545(a)(3), (e). If an ALJ does not conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant has the ability to perform the requirements of his or her past relevant work. *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). Conversely, if the claimant either cannot perform or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do *any* other work in light of his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his or her RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request

review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either make a decision or refer the matter to another ALJ. *Id.* § 404.983.

## II.  BACKGROUND

**A.  Procedural History**

Plaintiff, Dolores Sandoval, is a 50-year-old woman who alleges to be too disabled to work. (AR 128.)[2] On April 26, 2016, Plaintiff filed an application for SSI under Title XVI of the Act, alleging disability beginning June 17, 2013.[3] (AR 128, 243-49.) The

---

[2] Plaintiff filed a prior application for SSI on June 17, 2013 and the ALJ, Robert Iafe, found Plaintiff not disabled on September 12, 2015. (AR 22-23.) This first application is not at issue here.

[3] The ALJ erroneously stated that Plaintiff filed her application on April 29, 2016. (AR 22.) This error is not legally relevant.

Commissioner denied the application initially on September 2, 2016, and again upon reconsideration on March 16, 2017. (AR 150-54, 160-65.) Plaintiff then requested a hearing before an ALJ. (AR 167-68.) The ALJ, Randolph E. Schum, heard Plaintiff's case on September 12, 2018. (AR 73-88.) The ALJ found Plaintiff was not disabled on December 31, 2018. (AR 34.) On January 9, 2019, Plaintiff requested review of the ALJ's decision by the Appeals Council. (AR 4.) On June 7, 2019, the Appeals Council declined further review and the ALJ's decision became final. (AR 1-3.) On August 7, 2019, Plaintiff filed the complaint in the instant case seeking review of the ALJ's decision.

**B.    Medical History[4]**

### 1.    Mental Health Summary

Plaintiff met with Darin J. Arsenault, Ph.D., monthly for psychotherapy. At an appointment on March 23, 2016, Plaintiff reported a history of anxiety and presented with anxious and fearful thoughts, depressed mood, diminished interest, excessive worry, racing thoughts, and restlessness. (AR 400.) Dr. Arsenault noted that Plaintiff's SSI appeal had been rejected, and her Citalopram dose was recently increased. (AR 402.) He recorded some progress, diagnosed moderate major depressive disorder, and assessed GAF[5] at 60. (AR 401, 405.)

---

[4] The ALJ found that Plaintiff's Title XVI protective filing date was April 29, 2016 and that Plaintiff failed to meet the requirements of 20 C.F.R. § 416.1435(b). (AR 22.) Accordingly, the ALJ only considered Plaintiff's medical records from April 29, 2016 to December 31, 2018. Because Plaintiff did not raise an issue with this, the Court will consider evidence only from April 29, 2016 to December 31, 2018. The Court notes that much of the evidence in the Administrative Record is duplicative.

[5] A GAF score is a point-in-time snapshot assessment of an individual's level of functioning, useful in planning treatment. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-IV) 32-34 (4th ed., 1994). GAF scores include a significant number of non-medical factors, such as financial and legal troubles, which do not constitute work-related functional limitations resulting from medical impairments. DSM-IV at 33. A GAF between 61 and 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning

Plaintiff met with Dr. Arsenault on May 17, 2016 to address her depression. (AR 407.) She presented with anxious and fearful thoughts, depressed mood, fatigue, irritability, difficulty sleeping, and difficulty concentrating, but recognized that her anxiety and depressed mood has "lessened." (AR 407, 409.) Because Plaintiff reported that the Citalopram was not working, Dr. Arsenault suggested she visit the psychiatry department to identify other potential medications and assessed GAF at 60. (AR 409, 412.)

Dr. Arsenault completed a psychiatric review form on May 17, 2016 and diagnosed major depressive disorder. (AR 773.) Dr. Arsenault checked boxes indicating Plaintiff had sleep disturbance; mood disturbance; feelings of guilt and worthlessness; blunt, flat, or inappropriate affect; and generalized persistent anxiety. (*Id.*) He stated that the clinical findings which demonstrate the severity of Plaintiff's mental impairments were increased depressed mood, problems sleeping and concentrating, feelings of guilt, anxiety, problems relaxing, restlessness, and chronic pain. (AR 774.) He listed Plaintiff's medications as Citalopram, Lorazepam, Gabapentin, Acetaminophen, and Tylenol with Codeine. (*Id.*) He noted that Plaintiff's course of treatment was cognitive-behavioral therapy with a fair prognosis and noted that Plaintiff's psychiatric condition exacerbates her experiences of pain. (*Id.*) He indicated that Plaintiff would miss work more than three times a month and would be off task more than 20% of the workday because of her anxiety, depression, and pain. (AR 775.) He stated that Plaintiff does not have any mental health impairments that were not amenable to treatment. (AR 775.) However, he could not assess the degree to which Plaintiff's mental impairments affected her ability to perform work-related activities. (AR 776.) Finally, he indicated that Plaintiff had a residual disease process such

---

(e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34. A GAF between 51 and 60 reflects "[m]oderate symptoms (e.g., depressed mood and mild insomnia) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV at 34.

that even a minimal increase in mental demands or change in work environment would cause Plaintiff to decompensate and get overwhelmed. (AR 777.)

Psychotherapy visits from June through September 2016 centered around Plaintiff's anxiety. (*See* AR 1639, 1634, 987.) At all three appointments, Plaintiff presented with depressed mood and diminished interest or pleasure. (*Id.*) In June, she also presented with difficulty concentrating, excessive worry, fatigue, guilt, poor judgement, racing thoughts, and restlessness. (AR 1639.) In August, she also presented with excessive worry, anxious and fearful thoughts, and was easily startled. (AR 1634.) In September, she also reported difficulty falling asleep, poor judgement, and racing thoughts. (AR 987.) At all three appointments, Plaintiff's mental status exam was normal in appearance, build, posture, eye contact, activity, perception, hallucinations, delusions, cognitions, intelligence, insight, and judgement, and she had logical thought process. (AR 1640, 1635, 988.) Her attitude at all three appointments was anxious, her mood was depressed anxious, her affect was constricted flat, and her thought content was preoccupied ruminative. (*Id.*) Her speech was clear in June but pressured overproductive in August and September.[6] (*Id.*) Her GAF was 60 at each visit. (*Id.*)

On November 2, 2016, Plaintiff complained of severe and daily chronic pain. (AR 980.) Dr. Arsenault noted minimal progress, that Plaintiff's anxiety and depressed mood "seem to be stable and not reducing," and discussed the importance of adherence to therapy recommendations such as walking and taking time outs. (*Id.*) Plaintiff's mental status exam was normal except for anxious attitude, anxious irritable mood, constricted affect,

---

[6] "Pressured speech is commonly seen as a symptom of bipolar disorder. When you have pressured speech, you have an extreme need to share your thoughts, ideas, or comments. [¶] It's often a part of experiencing a manic episode. The speech will come out rapidly, and it doesn't stop at appropriate intervals. It's difficult to understand what's being said during pressured speech." *Pressured Speech Related to Bipolar Disorder*, https://www.healthline.com/health/bipolar-disorder/pressured-speech (July 28, 2020).

19-CV-1477-WVG

pressured overproductive speech, tangential thought process, and preoccupied thought content. (AR 981.) Her GAF was assessed at 60. (AR 982.)

Dr. Arsenault completed another psychiatric review form on November 2, 2016 and diagnosed major depressive disorder. (AR 348.) He checked boxes indicating Plaintiff had appetite disturbance; sleep disturbance; mood disturbance; recurrent panic attacks; feelings of guilt and worthlessness; blunt, flat, or inappropriate affect; decreased energy; persistent irrational fears; generalized persistent anxiety; easy distractibility; and increased isolation. (*Id.*) Clinical findings included anxiety, panic, depressed mood, difficulties with concentration and memory, problems sleeping and eating, restlessness, distractibility, chronic pain, and past traumatic memories. (AR 349.) Treatment was cognitive-behavioral therapy with a fair prognosis, and it was noted that Plaintiff's psychiatric condition exacerbated her experiences of pain. (*Id.*) Dr. Arsenault again indicated that Plaintiff would miss work more than three times a month and would be off task more than 20% of the workday as a result of her anxiety, depressed mood, and pain. (AR 350.) However, he again stated that he was unable to assess the degree that Plaintiff's mental impairments affect her ability to perform various work-related activities. (AR 351.)

At an appointment on December 5, 2016, Plaintiff reported that she had a coffee-triggered panic attack while driving at night. (AR 976.) Her mental status exam was the same as the last appointment except for a depressed anxious mood and logical thought process. (AR 977.) Dr. Arsenault noted good progress and her GAF remained at 60. (AR 976, 978.)

Plaintiff met with Psychiatrist Maria C. Court, M.D., on March 3, 2017 to initiate medication management. (AR 1610.) Her mental status exam was completely normal except for an anxious mood. (AR 1612.) Dr. Court diagnosed Plaintiff with panic disorder in addition to her previous diagnosis of moderate major depressive disorder, but Plaintiff refused the medication suggested. (AR 1612.) GAF was assessed at 60. (*Id.*)

Psychotherapy visits in April through August 2017 focused on Plaintiff's anxiety. (AR 1605, 1600, 1594.) In April, she told Dr. Arsenault that her SSI was denied, her father

was ill, and her father-in-law died. (AR 1605.) In May, she reported that she had another panic attack after her disability appeal was denied. (AR 1600.) In August, Plaintiff reported stress about possibly having to move out, her finances, and social security. (AR 1595.) Plaintiff's mental status exam at all three of the appointments revealed normal appearance, posture, eye contact, activity, perception, hallucinations, thought content, delusions, cognition, average, insight, and judgement. (AR 1606, 1601, 1596.) Her attitude was anxious, her mood was depressed anxious, and her affect was constricted at all appointments. (*Id.*) Her speech was clear in April but pressured in May and August. (*Id.*) Her thought process was logical in April and May but tangential in August. (*Id.*) Plaintiff's GAF remained at 60 at all three appointments. (AR 1607, 1602, 1597.)

Plaintiff reported constant anxiety at appointments on October 13, 2017 and March 18, 2018. In March, she reported a panic attack while driving and persistent back pain, for which Dr. Arsenault referred her to a chiropractor. (AR 1584.) Mental status exams at both appointments were normal except for anxious attitude, depressed anxious mood, and constricted affect. (AR 1590, 1584.) Plaintiff's GAF remained at 60 at both appointments. (AR 1591, 1585.)

At a therapy appointment on May 18, 2018, Plaintiff described incapacitating, constant, chronic lower back pain at level 9 but was "walking unassisted." (AR 1576.) She recognized that her pain increased as her anxiety increased and asked to see a psychiatrist. (*Id.*) Plaintiff's mental status exam indicated that she had an anxious attitude, depressed anxious mood, constricted flat affect, pressured speech, tangential thought process, and preoccupied thought content. (AR 1578.) Her GAF was assessed at 60. (AR 1579.)

Plaintiff met with psychiatrist Edward Navakas, M.D., on June 25, 2018 to initiate medication management to treat anxiety and depression in the context of chronic pain. (AR 1569.) Plaintiff walked in a "tentative, stooped" posture, reported pain and regular crying, and stated that her inability to work and pay her bills contributed to her panic attacks and depression. (*Id.*) Plaintiff had never been psychiatrically hospitalized, attempted suicide, or seen a psychiatrist. (*Id.*) She denied despondency, intent to harm herself or others, intent

10

to commit suicide, lability, agitation, and aggression. (*Id.*) Dr. Navakas noted that Plaintiff appeared alert and oriented, had intact memory, had preserved cognition, had no mania or hypomania, and had no evidence of psychosis but appeared to "be in pain and must stand every few minutes to relieve it." (*Id.*) Plaintiff's mental status exam was normal in appearance, build, posture, eye contact, activity, perception, thought content, cognition, intelligence, insight, and judgement, with cooperative attitude, depressed anxious mood, full affect, clear speech, logical thought process, and denial of hallucinations and delusions. (AR 1572.) Dr. Navakas diagnosed moderate depressive disorder and panic disorder and assessed GAF at 60. (*Id.*) He refilled Plaintiff's Citalopram prescription and reduced her Lorazepam prescription. (AR 1573.)

Plaintiff reported anxiety, panic, and irritability at her last appointment with Dr. Arsenault on July 30, 2018. (AR 1563-64.) Her mental status exam was normal except for anxious attitude, depressed mood, constricted affect, pressured overproductive speech, tangential thought process, and preoccupied thought content. (AR 1565.) Her GAF remained at 60. (AR 1565-66.)

Dr. Arsenault completed an additional psychiatric review form on July 30, 2018 and diagnosed recurrent, moderate major depressive disorder and panic disorder without agoraphobia. (AR 1543.) He stated that clinical findings showed that Plaintiff was depressed, had poor eating and sleeping habits, problems with concentration, poor outlook, anxiety, restlessness, irritability, and fatigue. (*Id.*) Treatment was cognitive behavioral therapy with a guarded prognosis. (*Id.*) Dr. Arsenault stated that he was unable to assess the degree to which Plaintiff's mental impairments affected her ability to perform various work-related activities, how often Plaintiff's impairments would cause absences from work, and how often Plaintiff would be off task in the workplace due to her mental health symptoms. (AR 1544-46.) He opined that Plaintiff's psychiatric condition exacerbated her experiences of pain and noted that Plaintiff had "made progress managing depressed mood, anxiety, [and] panic." (AR 1547.)

Plaintiff saw Dr. Navakas again on August 21, 2018 complaining of frequent crying, "anxiety [that] is constantly with her and intermittently swells into panic," and frustration that she "can't earn a living the way [she] used to." (AR 1549.) She reported hearing voices of her dead sister for the last two months only and Dr. Navakas explained that he would have to treat that "potentially serious symptom." (*Id.*) Dr. Navakas noted that Plaintiff's reluctance to use potentially addictive medication "complicates her recovery a bit" and that her "cognitive processes are slowly becoming influenced by her depressive feelings and the psychosis that may be being induced." (*Id.*) Her activities of daily living were good, her appetite was fair, her memory was intact, and her sleep was delayed and broken because she refused sleep medication. (*Id.*) Plaintiff's mental status exam revealed full affect, clear speech, logical thought process, normal perception, normal cognition, average intelligence, normal insight, normal judgement, depressed, anxious, and irritable mood, depressive thought content, occasional and intermittent hallucination, and no delusions. (AR 1552.) Dr. Navakas diagnosed Plaintiff with moderate depressive disorder, panic disorder, insomnia due to mental disorder, and unspecified psychosis and assessed GAF at 55. (AR 1552.) He refilled her previous medications and added Abilify, an antipsychotic, for "emergent psychosis." (AR 1553.)

There are records of Plaintiff's depression screenings from 2013 until 2018. (AR 2283-85.) Consistent with the protective filing date, mental health questionnaires on May 17, 2016; August 8, 2016; September 21, 2016; November 2, 2016; December 5, 2016; March 10, 2017; and April 11, 2017 reveal mild depression. (AR 2284-85.) Questionnaires on May 24, 2017; August 25, 2017; and October 13, 2017 show moderate depression. (AR 2285.) A depression screening on February 12, 2018 was positive. (*Id.*)

### 2. Physical Health Summary

#### a. Sweetwater Medical & Cardiovascular Institute, Cardiology of Southern California

Plaintiff met with Dr. Benjamin Camacho at Sweetwater Medical & Cardiovascular Institute on April 28, 2016 to address her recurring chest pain. (AR 432-33.) He diagnosed

19-CV-1477-WVG

obesity, sciatica, nonrheumatic valve insufficiencies, unspecified cardiac arrhythmias, atherosclerotic heart disease of native coronary artery with unspecified angina pectoris, mixed hyperlipidemia, chest pain, and low back pain. (AR 435-36.)

Plaintiff met with Cardiologist Dr. Albert Sharf at Cardiology of Southern California on August 5, 2016. (AR 1097.) His assessment included atypical angina, low cardiac risk with a mildly abnormal EKG, claudication, edema due to varicose veins, annular lower spinal tear, osteoarthritis, and allergies. (AR 1099-1100.) He suggested anxiety reduction, dietary compliance, and medication compliance. (AR 1100.)

A lower venous extremity ultrasound dated August 8, 2016 showed that Plaintiff did not have deep venous thrombosis but had varicose veins in both legs. (AR 1109.) A lower extremity arterial ultrasound on the same day showed normal triphasic signals at all levels of the bilateral lower extremities without evidence of significant stenosis. (AR 1110.)

Plaintiff saw Dr. Sharf on September 2, 2016 with no new findings. (AR 1093-96). On September 21, 2016, Dr. Sharf added mitral valve prolapse to his previous diagnoses. (AR 1091.) An echocardiogram report dated September 7, 2016 revealed mild abnormalities. (*See* AR 1108). A Stress Echo report dated September 30, 2016 revealed no chest pain, no ECG changes, no arrhythmia, good workload, and good heart rate. (AR 1102.)

An echocardiogram report dated June 12, 2017 was largely normal with trace or minimal findings only. (*See* AR 1796, 1773.) On September 22, 2017, Dr. Sharf added mild mitral valve regurgitation and gastritis to Plaintiff's previous diagnoses. (AR 1771.) On March 29, 2018, Dr. Sharf added mild CMP to Plaintiff's previous diagnoses, for which she denied medication. (AR 1761-62.) Dr. Sharf added Sinus Pause and SVT in Holter, varicose veins, scoliosis, degenerative disc disease, and lower back pain to Plaintiff's previous diagnoses on June 11, 2018. (AR 1754-56.) The results of an echocardiogram dated July 9, 2018 were largely normal with only mild and trace findings. (*See* AR 1788, 1752-54.) Plaintiff's last visit with Dr. Sharf on August 16, 2018 revealed no new findings. (*See* AR 1750-52.)

### b.   San Ysidro Health Center, Paradise Valley Hospital

Plaintiff often went to San Ysidro Medical Center to see her Primary Care Physician, Brian Snook, M.D., and visit Urgent Care.[7] She went to the Emergency Room at Paradise Valley Hospital eighteen times from May 2014 until December 2017.

At the start of the medical evidence, Plaintiff's listed chronic problems included anxiety, depression, bilateral low back pain with sciatica, GERD, obesity, chronic pain, lumbago, and varicose veins. (AR 445, 1867.) Plaintiff went to Urgent Care or San Ysidro Health Center to address cold-like symptoms on nine separate occasions from May 2016 to January 2018. (*See* AR 445-49, 1888-1892, 1808-12, 2420-24, 2414-19, 2409-13, 2322-25, 2314-21, 2309-13.)

On June 6, 2016, Plaintiff saw Dr. Snook to follow up on her chronic back pain. (AR 1897.) Dr. Snook refilled Plaintiff's Gabapentin (pain control), Citalopram (antidepressant), Baclofen (pain control), and Tylenol with Codeine (pain control), and his assessment included chronic low back pain and other chronic pains. (AR 1898, 1900.) Her physical exam was normal except for back tenderness. (*See* AR 1900.)

Plaintiff visited the Emergency Room on June 9, 2016 complaining of "mild, but 10/10" chest pain radiating to the left shoulder. (AR 1280.) Upon exam, Plaintiff had no back tenderness, normal range of motion in the upper and lower extremities, tenderness in the left anterior shoulder region, non-tender lower extremities, normal neurological and psychiatric findings with no hallucinations, normal thought patterns, and appropriate

---

[7] Plaintiff included the following statement in her motion for summary judgement, "Dr. Brian Snook, DO diagnosis; depressed mood with suicidal ideation (AR 2100)." (Doc. No. 16 at 8.) First, this excerpt is from an office visit on October 14, 2013, which is before the protective filing date of April 29, 2016 and therefore not considered. Second, Plaintiff misunderstood this evidence. "Suicidal ideation" is found under the negative column, which means that Plaintiff did not exhibit suicidal ideation. (AR 2100.) Furthermore, Plaintiff included another medical excerpt, "Dr. Snook treats her pain finding; severity level of moderate-severe." (Doc. No. 16 at 8.) This excerpt is from an office visit on June 15, 2015, which is also before the protective filing date of April 29, 2016 and therefore not in evidence. (AR 2448-52.)

insight. (AR 1282). At a follow-up visit at San Ysidro, Dr. Medina noted that Plaintiff had "frequent visits" to the emergency room and health center and diagnosed Plaintiff with generalized anxiety disorder (AR 1893, 1896.)

On July 21, 2016, Plaintiff saw Dr. Snook regarding a spider bite and had a normal psychiatric exam. (AR 1882, 1886.) She saw him again on July 26, 2016 to discuss her cardiologist's suggested blood pressure medication and had a normal psychiatric exam. (AR 1876, 1880.) Plaintiff went to Urgent Care on October 1, 2016 to address her stomach pain and was advised to take her medication as directed and get surgery for her hernia. (AR 893-94.)

Plaintiff visited Dr. Snook on October 25, 2016 to follow up on her moderate-severe worsening back pain. (AR 951.) Dr. Snook noted that Plaintiff "can't work" due to her condition. (*Id.*) Her physical exam revealed mild ankle swelling, back tenderness, decreased range of motion secondary to pain in the back, cautious walking, a limp, shoulder tenderness, and right and left radiation during a straight leg raise test. (AR 955.) Dr. Snook assessed lumbago with sciatica and lumbar degenerative disc disease and referred Plaintiff to Radiology for an extremity study. (AR 957.)

A letter from Dr. Snook dated October 26, 2016[8] states that Plaintiff's x-rays and MRIs from February 7, 2013 revealed severe degenerative disc disease at L5-S1 (AR 881), degenerative discopathy at L5-S1 with mild right foraminal stenosis (AR 882), and mild degenerative discopathy at L4-5 with a posterior central annular tear but with no herniation or stenosis (AR 883). (AR 878.) Another x-ray from that day revealed no acute disease in the right knee and no acute disease in the right foot. (AR 2169, 2168.) Dr. Snook opined that despite pain management, referrals to specialists, and physical therapy, Plaintiff's pain has become worse and affected her ability to perform daily activities and work. (*Id.*) In a medical source statement from the same date, Dr. Snook opined that Plaintiff could lift or

---

[8] It appears that the ALJ mistakenly referred to this document and medical source statement as created on June 7, 2016. (AR 31.)

carry less than ten pounds, stand or walk less than two hours per day, and sit for only one to two hours per day. (AR 879-80.) Furthermore, he opined that Plaintiff could never climb, balance, stoop, kneel, crouch, crawl, reach, or manipulate. (AR 880). He stated that Plaintiff's use of a back support brace and cane is medically necessary, and that Plaintiff's pain requires a change in position every five to ten minutes. (AR 879-80.) In making these assertions, Dr. Snook relied on the MRI and X-Ray findings above. (*See id.*)

Plaintiff went to Urgent Care on November 2, 2016 for a fall which aggravated her back and leg pain. (AR 994.) Upon examination, Plaintiff had muscle spasms in the spine, moderate pain with motion in the thoracic spine, severe pain with motion in the lumbar spine, and right hip tenderness. (AR 948.) An x-ray of the thoracolumbar spine on November 2, 2016 revealed minimal scoliosis with minimal multilevel spondylosis thoracic spine and moderate degenerative disc disease at L5-S1. (AR 1056.) An x-ray of the right hip on the same day revealed no chronic or acute findings. (AR 1055.) An x-ray of the left shoulder on the same day revealed normal findings. (AR 1057.)

On November 3, 2016, Physical Therapist Robert Mayo, P.T. completed a physical therapy examination note and noted that Plaintiff had decreased strength and range of motion in the bilateral shoulders and mid-back, gait disturbance, and pain throughout the shoulders and mid-back. (AR 1534.).

She saw Dr. Snook on November 29, 2016 to follow up on her shoulder pain from the fall. (AR 938.) Her physical exam revealed spine and shoulder tenderness, decreased range of motion secondary to pain, and intact sensation. (AR 942.) Dr. Snook referred Plaintiff to physical therapy. (AR 943.)

On December 2, 2016, Plaintiff went to Urgent Care for ear problems and a headache and was prescribed ear drops. (AR 930, 933, 934.)

An MRI of Plaintiff's lumbar spine from Imaging Healthcare Specialists dated December 7, 2016 showed multilevel spondylosis without a focal disc herniation, spinal stenosis, or foraminal narrowing and severe disc desiccation and loss in height at L5-S1 with chronic degenerative endplate changes anteriorly but without root impingement. (AR

886.) There was trace disc desiccation without bulge or herniation, no spinal stenosis or foraminal narrowing, and mild posterior facet arthropathy with ligamentum flavum hypertrophy at L1-L2, L2-L3, and L3-L4. (*Id.*) At L4-L5, there was mild disc desiccation with trace bulging and central annular tear without spinal stenosis or foraminal narrowing, and mild posterior facet arthropathy. (*Id.*) At L5-S1, there was severe disc desiccation with trace bulging and ridge of osteophytes without significant spinal stenosis or foraminal narrowing. (*Id.*)

Plaintiff saw Dr. Snook to address her shoulder and lower back pain on December 26, 2016. (AR 924.) Plaintiff's physical and psychiatric exams were normal. (AR 928.) Dr. Snook diagnosed severe degenerative disc disease at L5/S1 and referred Plaintiff to acupuncture. (AR 928-29.)

Plaintiff went to the Emergency Room on December 27, 2016 to address her chest pain. (AR 1255.) Her physical and neurological exam was completely normal with normal range of motion in the upper and lower extremities, non-tenderness in the upper and lower extremities, no tenderness in the back, and normal orientation, gait, motor, and sensory functions. (AR 1257.) Plaintiff went to Urgent Care on January 12, 2017 to address diarrhea and vomiting and was diagnosed with acute gastroenteritis. (AR 920, 923.) She saw Dr. Snook on January 16, 2017 for her headaches, which were likely caused by dehydration from her recent food poisoning. (AR 914, 918.)

On January 17, 2017, Plaintiff saw Dr. Snook to follow up on her left shoulder pain. (AR 907.) Upon examination, Plaintiff had pain with left shoulder rotation and "no gross deformity noted." (AR 911.) Dr. Snook assessed unspecified shoulder pain and referred her to physical therapy. (AR 911-12.) Plaintiff met with Dr. Snook on January 24, 2017 to address her moderate, intermittent back pain that radiated to her thighs. (AR 900.) Dr. Snook diagnosed lumbago and suggested yoga. (AR 905.)

Plaintiff went to Urgent Care on February 15, 2017 for earaches and headaches. (AR 986.) The doctor noted that Plaintiff had a "normal neurological exam" and her headaches were relieved with pain medication. (AR 899.)

19-CV-1477-WVG

On March 25, 2017, Plaintiff went to the Emergency Room complaining of mild abdominal pain. (AR 1232.) Upon examination, Plaintiff had a normal inspection of the back, upper, and lower extremities with normal range of motion, normal capillary refill, and no edema. (AR 1234.) An x-ray dated March 23, 2017 revealed hepatic steatosis. (AR 2149.) Plaintiff followed up on this ER visit and her moderate-severe back pain with Dr. Snook on March 30, 2017. (AR 1801.) Her physical exam revealed decreased lumbar range of motion secondary to pain and a hernia. (AR 1805.) Dr. Snook referred Plaintiff for a back-support brace or belt. (AR 1806.)

Plaintiff went to Urgent Care on May 11, 2017 for an earache from an infected tooth. (AR 1797.) She went to Urgent Care on May 16, 2017 for left leg and abdominal pain. (AR 2437.) A physical exam revealed mild swelling and moderate pain with motion of the left knee. (AR 2440.) An x-ray of the left femur showed no significant abnormalities. (AR 2147.)

On June 4, 2017, Plaintiff went to the Emergency Room for mild chest discomfort. (AR 1205.) Plaintiff had a normal inspection of the back, upper, and lower extremities with no back tenderness, normal range of motion in the upper and lower extremities, non-tenderness in the upper and lower extremities, normal capillary refill of the upper and normal extremities, no edema of the upper and lower extremities, and pulse/motor/sensory assessment intact. (AR 1207.)

Plaintiff saw Dr. Snook for joint pain that is aggravated by climbing stairs on June 5, 2017. (AR 2431.) Upon examination, Plaintiff had mild tenderness in the knees and an intact range of motion. (AR 2435.) Plaintiff went to Urgent Care on June 21, 2017 for severe right foot pain. (AR 2425.) Her physical exam revealed swelling and moderate pain with motion in the right foot. (AR 2428.) An x-ray did not show any apparent fractures or swelling but did show a heel spur. (AR 2429, 2146.)

On July 17, 2017, Plaintiff saw Dr. Snook to address her back pain. Dr. Snook assessed lumbago with sciatica and referred her for additional studies. (*See* AR 2402, 2407.) Plaintiff went to the Emergency Room on August 2, 2017 for chest pain. (AR 1178.)

Upon examination, Plaintiff had no back tenderness, no tenderness, no edema, and normal range of motion in the upper and lower extremities. (AR 1180.) Plaintiff returned to the Emergency Room on August 26, 2017 for epigastric pain. (AR 1149.) Her physical exam revealed good capillary refill in the upper extremities, no edema, clubbing, or cyanosis in the lower extremities, no cervical, thoracic, or lumbar midline bony tenderness, and good range of motion and no tenderness of the back. (AR 1150.) ECG testing, a cardiac monitor, a chest x-ray, labs, and a urinalysis revealed no abnormal findings. (AR 1150-51.)

Plaintiff met with Dr. Snook on August 28, 2017 to address her back and knee pain. (AR 2395.) Dr. Snook diagnosed scoliosis, ordered a back support brace, knee support brace, referred her to physical therapy, and refilled her pain medication. (AR 2400-01.) On September 14, 2017, Plaintiff went to Urgent Care for her moderate-severe, persistent back pain. (AR 2388.) Upon examination, Plaintiff had normal capillary refill and intact sensation in the lumbar spine; no bony tenderness, full range of motion but with pain, normal capillary refill, and intact sensation in the right side and right knee; normal gait, cervical spine, thoracic spine, hip, left side, and left knee; and no edemas. (AR 2392.) The doctor diagnosed low back pain and radicular pain of the right lower extremity and prescribed a pain-relieving gel. (*See* AR 2389, 2393.)

On September 20, 2017, Plaintiff went to Urgent Care for chest, shoulder, and ear pain. (AR 2382.) Her physical exam revealed tenderness in the left shoulder and left ribs and moderate pain with motion in the shoulder. (AR 2385.) The doctor diagnosed Costochondritis and unspecified left shoulder pain. (AR 2386.) A rib and chest x-ray dated September 20, 2017 revealed normal findings. (AR 2143.) A left shoulder x-ray on the same day revealed normal findings. (AR 2144.) Plaintiff saw a nurse at San Ysidro on October 31, 2017 for diarrhea and ear pain. (AR 2374.) Upon examination, "visual overview of all four extremities [was] normal," Plaintiff's gait, cervical spine, thoracic spine, lumbar spine, shoulders, elbows, hands, hips, ribs, pelvis, knees, and feet were normal. (AR 2380.) On November 13, 2017, Plaintiff went to Urgent Care for abdominal pain. (AR 2367.) Plaintiff denied back, neck, and joint pain and her physical exam revealed

normal extremities, normal feet, and no edema. (AR 2370, 2371.) An abdomen and chest x-ray dated November 13, 2017 revealed normal findings. (AR 2142.)

Plaintiff went to San Ysidro on November 15, 2017 to address her abdominal pain. (AR 2360.) The doctor noted that Plaintiff was "anxious, talk[ed] a lot, but friendly." (AR 2364.) On November 18, 2017, Plaintiff went to Urgent Care for her back pain post-fall. (AR 2353.) Upon examination, Plaintiff had mild right knee tenderness; no effusion; no warmth or redness; she was able to flex, extend, and hold her leg in an outstretched position on her own without problem; had no locking; had full strength; intact sensation; and intact reflexes. (AR 2357.) She had bilateral lumbar tenderness, no bony abnormalities, normal gait, and normal findings in the spine, shoulders, elbows, hands, hips, ribs, pelvis, left knee, and feet. (*Id.*) The doctor diagnosed acute right knee pain and low back pain with sciatica and noted that Plaintiff refused x-Rays. (AR 2357-85.)

Plaintiff saw Dr. Snook on November 20, 2017 to follow up on her moderate, intermittent back pain. (AR 2345.) Her physical exam revealed mild tenderness in the lumbar and thoracic paraspinal muscles and was otherwise normal. (AR 2351.) She came back on December 1, 2017 to discuss the results of her esophagram, which showed some tertiary esophageal contractions. (AR 2339, 2343.)

On December 6, 2017, Plaintiff went to the Emergency Room for abdominal pain. (AR 1113.) Upon examination, Plaintiff "appeared in no distress" and had no costovertebral angle tenderness in the back, no clubbing, no cyanosis, no edema, and "move[d] all extremities freely and ambulate[d] [without] assistance." (AR 1114.) She followed up at Syn Ysidro on December 8, 2017. (AR 2332.) The doctor diagnosed GERD and suggested she continue her medication. (AR 2337.)

Plaintiff went to Urgent Care on December 14, 2017 to address her ear pain. (AR 2326.) Her physical and psychiatric exam was completely normal. (AR 2329-30.) She went to San Ysidro on February 1, 2018 to address her medication reactions. (AR 2301.)

On February 12, 2018, Plaintiff saw Dr. Snook to follow up on her moderate, fluctuating, intermittent back pain and depression. (AR 2292.) Dr. Snook assessed GAF at

19-CV-1477-WVG

60, diagnosed depression, and prescribed Vistaril for anxiety. (AR 2292, 2294, 2298.) Upon examination, Plaintiff had mild tenderness of the knees, normal orientation and memory, and appropriate mood and affect. (AR 2298.)

Plaintiff saw Dr. Snook on February 27, 2018 to address her headaches. (AR 2283.) Dr. Snook noted that Plaintiff "asks many detailed questions" and is "anxious" but her neurological and psychiatric exam was completely normal. (*See* AR 2289.)

Plaintiff went to Urgent Care on March 8, 2018 due to her recent fall and knee and back pain. (AR 2278.) A physical exam revealed tenderness over the lower lumbar region, intact sensation, mild swelling in the right knee, no effusions or ecchymosis, full strength, and knee tenderness. (AR 2281.) Plaintiff was able to "bear weight, flex, and extend knees" and had no edema. (*Id.*) The doctor diagnosed lumbar back and knee pain, ordered an x-ray of the lower back, and noted a likely muscle sprain. (AR 2281.) An x-ray of the lumbar spine dated March 8, 2018 revealed mild scoliosis, degenerative changes at L5-S1, and moderately severe degenerative disc disease at L5-S1 with disc space narrowing and endplate sclerosis but no significant subluxation. (AR 2140.)

On March 19, 2018, Plaintiff went to San Ysidro to follow up on her chest pain.[9] (AR 2270.) Tests for chest pain and shortness of breath in the ER were normal, but Plaintiff had "so many" concerns, insisted that "something" is causing her issues, asked for "blood tests that can detect cancer," refused to have a recommended colonoscopy, and was concerned about losing weight even though she lost no weight and is considered overweight. (AR 2270.) Upon examination, Plaintiff had a small bruise on the left leg but a normal gait, cervical spine, thoracic spine, lumbar spine, shoulders, elbows, hands, hips, ribs, pelvis, knees, and feet. (AR 2275.)

---

[9] It appears that Plaintiff went to the Emergency Room on March 15, 2018 but there is no record of this visit in the Administrative Record.

Plaintiff saw Dr. Snook on April 17, 2018 to follow up on her moderate back pain. (AR 2263.) Dr. Snook diagnosed low back pain and obesity and recommended a healthy diet and exercise. (AR 2268.)

On May 22, 2018, Plaintiff went to Urgent Care to address her back, shoulder, and knee pain. (AR 2256.) Her physical exam showed a muscle spasm and moderate pain with motion in the cervical spine; a muscle spasm and severe pain with motion in the thoracic spine; a muscle spasm and severe pain with motion in the lumbar spine; left shoulder tenderness and moderate pain with motion; right shoulder tenderness and a mildly reduced range of motion; left hip tenderness; right hip tenderness; left knee tenderness and moderate pain with motion; right knee swelling and moderate pain with motion; left foot pain and moderate pain with motion; and right foot pain and moderate pain with motion. The doctor diagnosed cervicalgia (neck pain), bilateral thoracic back pain, low back pain potentially associated with radiculopathy, muscle spasm of the back, tendinitis of shoulder, and obesity. (AR 2261.) Plaintiff was told to continue medication as directed and use ice for pain. (*Id.*)

Plaintiff saw Dr. Snook on June 29, 2018 to follow up on her back pain. (AR 2250.) Upon examination, Plaintiff had gait disturbance and decreased lumbar range of motion secondary to pain. (AR 2254.) Dr. Snook diagnosed lumbago with sciatica and chronic pains. (AR 2255.)

A letter from Dr. Snook dated June 29, 2018 stated that Plaintiff's 2016 MRI revealed multilevel spondylosis, severe disc desiccation and loss at height at L5-SI with chronic degenerative endplate changes anteriorly but without nerve root impingement. (AR 1541.) These findings are reflected in an MRI of Plaintiff's lumbar spine dated December 7, 2016. (AR 886.) Dr. Snook opined that Plaintiff's pain had become worse and affected her ability to perform daily activities and work. (*Id.*) In a medical source statement from the same date, Dr. Snook opined that due to Plaintiff's chronic lumbar back pain with radiculopathy, severe lumbar degenerative disc disease, and bilateral knee and joint pain, Plaintiff could lift or carry less than ten pounds, stand or walk less than two hours, sit less

22

than one hour at a time, and needed to alternate standing and sitting multiple times per hour. (AR 1537-38.) He noted that he relied on MRI findings and clinical symptoms in making these assertions. (AR 1537-38.) Dr. Snook stated that Plaintiff used a medically-necessary cane. (AR 1538.) Dr. Snook opined that Plaintiff could never climb, balance, kneel, crouch, crawl, or reach; that she would miss work more than three times a month; and that she would be off task more than 20% of the workday. (AR 1539-40.) The impairments or symptoms that would cause these absences were low back pain, gait disturbance, doctors' visits, and narcotic pain medication. (*Id.*) He noted that Plaintiff's prognosis was fair, and her pain and ambulation were worsening. (AR 1540.)

Plaintiff's final visit with Dr. Snook was on August 9, 2018 to address her knee pain. (AR 2243.) Her physical exam revealed varicose veins and decreased lumbar range of motion secondary to pain. (AR 2247.) Dr. Snook's assessment included knee pain, chronic pain, low back pain, lumbar degenerative disc disease, varicose veins with pain, and obesity. (AR 2248.) In a letter dated August 9, 2018, Dr. Snook stated that there was documented imaging showing Plaintiff's severe degenerative disc disease and desiccation which was the cause of the lumbar pain that radiated to her legs. (AR 1548.)

Finally, a letter from Dr. Snook dated February 28, 2019 stated that Plaintiff had progressively worsening lumbar back pain, degenerative disc disease, and severe lumbar disc desiccation which affected her ability to perform daily activities and work. (AR 46.)

### 3.    Non-Treating Physician Evidence

#### a.    Brady Dalton, Psy.D. (Reviewing Doctor)

On August 3, 2016, after reviewing the evidence of record at the initial level, state agency reviewer, Brady Dalton, Psy.D., found that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (AR 121.) The doctor opined that although there was evidence of mild depression and anxiety, there were no hospitalizations and no objective medical evidence

indicating more than mild limitations. (AR 122.) Thus, he suggested that a non-severe psychology rating was appropriate. (*Id.*)

        **b.**     **Thomas Sabourin, M.D. Orthopedic Surgeon (Examining Doctor)**

On August 25, 2016, Plaintiff underwent an orthopedic consultative examination at the request of the Disability Determination Service (DDS) in response to her complaints of low back, mid back, upper back, shoulder, elbow, wrist, and knee pain stemming from a motor vehicle accident in 2010. (AR 867.) Thomas J. Sabourin, M.D., observed that Plaintiff walked very slowly, refused to get on the examination table, was "uncooperative," complained of pain throughout range of motion in the cervical spine, had tenderness in the cervical spine, had no spasms in the cervical spine, refused to do any back range of motion movements but bent down sixty to seventy degrees when sitting, had tenderness in the lumbar spine, and had no spasms, swelling, or warmth in the lumbar spine. (AR 869, 871.) She would not perform the supine straight leg raise test and sitting straight leg raising caused back pain. (*Id.*) Her range of motion was normal in the elbows, wrists, and ankles. (AR 870.) She complained of tenderness throughout the entire upper extremities, hip examination caused back pain, and she complained of back pain with knee range of motion but there was no gross instability, warmth, swelling, deformity, effusion, or crepitus. (AR 870.) Her neurological exam revealed intact sensation, no clonus, spasticity, or rigidity. (AR 870-71.) An MRI of the lumbar spine performed on May 13, 2013 revealed a desiccated disk without loss of disk space at L4-5, a small dorsal central annular tear at L5-S1, endplate changes, a disk bulge in the foramina, and foraminal stenosis with normal central canal and mild fact arthrosis. (AR 871.) Dr. Sabourin's impression was mild degenerative disk disease and generalized pain syndrome. (*Id.*) Dr. Sabourin opined that although Plaintiff refused to attempt significant range of motion tests, he could find "no true neurological disorder," he did not think she had any true radiculopathy, and he thought that Plaintiff's complaints were in "severe disproportion to the determinable condition." (*Id.*) Dr. Sabourin assessed that Plaintiff had some back problems but could lift or carry fifty pounds occasionally and twenty-five pounds frequently, stand and walk six hours of

an eight-hour workday and sit for six hours of an eight-hour workday, climb, stoop, kneel, and crouch frequently, and did not need a cane to ambulate. (AR 871-72.)

### c.   L. Tanaka, M.D. (Reviewing Doctor)

On September 1, 2016, after reviewing the evidence of record at the initial level, state agency physician L. Tanaka, M.D., found that Plaintiff's symptoms were not consistent with the objective medical evidence and accordingly felt Plaintiff was capable of a range of medium exertional capacity. (*See* AR 123-24.)

### d.   S. Brodsky, D.O. (Reviewing Doctor)

On February 22, 2017, after reviewing the evidence of record at the reconsideration level, state agency physician S. Brodsky, D.O., found that Plaintiff was capable of a light exertional capacity. (*See* AR 141-42.) The doctor gave little weight to Plaintiff's treating physicians because their opinions were based on subjective reports of symptoms. (AR 143.)

### e.   Celine Payne-Gair, Ph.D. (Reviewing Doctor)

On March 13, 2017, after reviewing the evidence of record at the reconsideration level, state agency reviewer Celine Payne-Gair, Ph.D., found that Plaintiff had mild limitations in understanding, remembering, or applying information; interacting with others; concentrating, persistence, or maintaining pace; and adapting or managing oneself. (AR 139.) The doctor noted that while Plaintiff reported hearing voices in a function report dated April 22, 2016 and the evidence indicates some depression and anxiety, there was no evidence of any psychosis, Plaintiff retains basic skills, and Plaintiff accordingly has non-severe mental limitations. (*Id.*)

### 4.   Non-Medical Reports and Testimony

### a.   Third-Party Function Report by Priscilla Sandoval

Priscilla Sandoval is Plaintiff's daughter and caretaker with County of San Diego In-Home Supportive Services. (AR 850.) She indicated that Plaintiff cannot stand and sit for too long, is always in pain, does not like to be left alone, and sleeps a lot due to depression and anxiety. (AR 335.) Priscilla Sandoval stated that Plaintiff lives alone with her son, can handle money, can follow directions, gets along well with authority figures,

and handles change in routine well. (AR 335-41.) However, she stated that Plaintiff cannot get dressed, bathe, shave, use the toilet on her own, cook, do chores, do housework, do yardwork, shop, and "hardly" goes outside. (AR 336-41.)

### b.   Plaintiff's Questionnaires and Reports

In a pain questionnaire dated April 19, 2016 Plaintiff asserted that her chronic back, knee, shoulder, and leg pain stemmed from an accident in 2010. (AR 266.) She stated that the pain occurs daily, lasts all day, and is exacerbated by sitting, standing, and walking. (*Id.*) She noted that she takes Gabapentin, Tylenol with Codeine, and Tramadol for pain and the medication causes dizziness and sleepiness. (AR 266-67.) Plaintiff stated that her daughter grocery shops for her, drives her around, and cooks for her. (AR 268.)

In a function report dated April 22, 2016 Plaintiff asserted that she has chronic pain, depression, crying spells, problems sleeping, anxiety, poor memory and concentration, and hears voices. (AR 270.) She stated that her daughter helps her get dressed and use the toilet, bathes her, brushes her hair, shaves her, gives her medicine, cooks for her, and shops for her. (AR 271-72.) She mentioned that she only leaves the house for doctors appointments, cannot leave the house alone, and drives only when she needs to. (AR 273.) However, Plaintiff can pay bills, count change, and handle a savings account. (*Id.*) She stated she has no hobbies or social activities and has problems getting along with others. (AR 274-75.) As to her abilities, she stated that her physical pain causes many limitations, she can only pay attention for ten minutes, she does not follow written instructions well, and she forgets spoken instructions. (AR 275.) She believes that she gets along "OK" with authority, does not handle stress well, and changes in routine would upset her. (AR 276.) She stated that she uses a cane and back brace. (AR 276.)

A function report dated October 19, 2016 was largely the same, except that Plaintiff added that she can use a checkbook, she is okay at following written and spoken instructions, and she is okay at handling changes in routine. (*See* AR 295-302.)

19-CV-1477-WVG

### c.   Plaintiff's Testimony

Plaintiff testified at the ALJ hearing on September 12, 2018 that she had an annular tear in her spine which causes difficulty in standing, sitting, or walking too long. (AR 76.) She testified that she had arthritis in both knees and chronic pain. (AR 77.) She stated that she used a prescribed cane because her knee pops and "hurts a lot" when walking. (AR 76.) Plaintiff also stated that she had chronic pains in her shoulders. (AR 81.) Because of this chronic pain, she could not move her shoulders or lift them to put her clothes on. (AR 81.) She reported that she "can't do anything" because she was "always in pain" and "can't move" (AR 80-81.) Plaintiff testified that she could lift up to five pounds, stand for five minutes, and walk a block. (AR 80.)

As to mental impairments, Plaintiff testified that she suffered from depression and anxiety, which led to problems waking up, sleeping, and eating. (AR 78.) Plaintiff testified that she "can't do anything" and stayed in bed a lot due to her depression. (AR 79.) She reported that her daughter provided significant daily support and did "everything" for her. (AR 79.) Plaintiff's daughter got Plaintiff out of and into bed, dressed her, cooked, cleaned the house, took her to the bathroom, and washed her. (AR 79, 82.) Plaintiff stated that she had no friends, no social life, and only left her house to go to doctors' appointments. (AR 80.) She stated that she had difficulties concentrating and could not think a lot but had a "pretty good" memory. (AR 81-82.)

## C.   ALJ's Findings

At step one of the sequential evaluation process described above, the ALJ found Plaintiff did not engage in substantial gainful activity since April 29, 2016, the SSI application date. (AR 25.) At step two, the ALJ found Plaintiff had the following severe impairments: mild degenerative changes of the lumbar spine, degenerative changes of the knees, and obesity. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 26.) In assessing RFC prior to step four, the ALJ found Plaintiff had the RFC to perform light

work as defined in 20 C.F.R. § 416.967(b). (AR 26.) Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, "sit for hours" in an eight-hour workday, stand and/or walk for six hours in an eight-hour workday. (*Id.*) Plaintiff should never climb ropes, ladders, and scaffolds. (*Id.*) Plaintiff can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. (AR 26-27.) Plaintiff should avoid concentrated exposure to extreme cold, vibration, unprotected heights, and moving and dangerous machinery. (AR 27.) At step four, the ALJ found Plaintiff had no past relevant work. (AR 32.) At step five, the ALJ found Plaintiff could perform other work that exists in significant numbers in the national economy. (AR 32.)

### III. STANDARD OF REVIEW

A district court will not disturb the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citation omitted).[10] Substantial evidence means more than a scintilla, but less than a preponderance. *Id.* Substantial evidence is evidence that a reasonable mind would consider adequate to support a conclusion. *Id.* "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citation omitted). If the evidence is subject to more than one rational interpretation, the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

### IV. DISCUSSION

First, Plaintiff challenges the ALJ's unfavorable decision on the grounds that the ALJ failed to adequately address Plaintiff's mental limitations as required by 20 C.F.R. § 404.1520(A). Second, Plaintiff challenges the ALJ's decision on the grounds that the ALJ improperly discounted her statements as to her pain. The Court addresses each assignment of error in turn.

---

[10] *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996) has been superseded on other grounds by 20 C.F.R. §§ 416.929, 404.1529(c)(3).

19-CV-1477-WVG

**A.    The ALJ Properly Addressed Plaintiff's Mental Limitations.**

Plaintiff contends the ALJ failed to properly address her mental limitations. First, Plaintiff alleges that the ALJ did not provide sufficient reasons for according the opinions of Plaintiff's treating physicians little weight. Second, Plaintiff argues that the ALJ failed to provide documentation of the "special technique" used to evaluate mental impairments. Defendant contends that the ALJ articulated appropriate reasons for discounting Plaintiff's treating physicians and provided documentation of the "special technique." The Court agrees with Defendant for the reasons set forth below.

**1.    The ALJ Properly Attributed Plaintiff's Treating Psychiatrist's and Psychologist's Opinions Little Weight.**

**a.    Applicable Law & Standard of Review**

The Ninth Circuit distinguishes three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In determining how much weight to afford any medical opinion, the ALJ may consider the length of the treatment relationship, the frequency of examinations, the nature and extent of the treatment relationship, the supportability of the physician's opinion with medical evidence, the consistency of the physician's opinion with the record as a whole, the specialization of the medical source opinion, and other factors raised by the parties. *See* 20 C.F.R. § 404.1527(c)(2)-(6).

If a treating physician's opinion is contradicted by another doctor's opinion, an ALJ may reject or assign it little weight only by providing "specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). An ALJ can meet this burden by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings." *Tommasetti v. Astrue*,

533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). The ALJ must do more than offer his conclusions; he must explain why his own interpretations, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). An ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than "ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it . . . [without a] substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012-13.

When evaluating conflicting medical opinions, an ALJ may disregard medical opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Britton v. Colvin*, 787 F.3d 1011, 1012 (9th Cir. 2015) (citation omitted).

### b.    Analysis

As a threshold matter, Plaintiff argues that treatment notes support Dr. Arsenault's evaluation that Plaintiff "is unable to sustain work due to her mental illness." (Doc. No. 16 at 16.) However, there is nothing in the record which indicates that this is Dr. Arsenault's opinion regarding Plaintiff's work capabilities. In fact, Dr. Arsenault stated in his most recent evaluation that he was "unable to assess" how often Plaintiff would miss work or be off task in the workplace due to her mental illness. (AR 1544-46.)

Furthermore, Plaintiff's assertion that her condition "became more severe in 2018" is also unsupported by the record. (Doc. No. 16 at 16.) In fact, Dr. Arsenault noted in July 2018 that Plaintiff "has made progress managing depressed mood, anxiety, [and] panic." (AR 1547.) Notwithstanding these mischaracterizations, the Court will now address whether the ALJ provided significant reasons for attributing Plaintiff's treating physicians little weight.

### i.    Treating Psychologist Darin Arsenault, Ph.D.

On one end of the spectrum, state agency reviewers B. Dalton, Psy.D. and Celine Payne-Gair, Ph.D. concluded Plaintiff had only mild mental limitations. (AR 121-22, 139.) On the other end, treating psychologist Dr. Arsenault diagnosed moderate depressive disorder. (AR 1543.) Although the contrary opinion of a non-examining doctor *by itself*

does not constitute substantial evidence that justifies rejection of a treating physician, an ALJ may reject the opinion of a treating physician based *in part* on the testimony of a nonexamining advisor. *See Lester*, 81 F.3d at 831. For example, the Ninth Circuit found that an ALJ properly rejected a treating physician's opinion not only due to the presence of contradictory opinions, but because it was unsupported by rationale or treatment notes and offered no objective medical evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Here, the ALJ provided reasons other than the mere existence of contradictory non-examining opinions in discounting Dr. Arsenault's opinion. Plaintiff did not address either of these reasons in her motion for summary judgement.

First, the ALJ stated that Dr. Arsenault's opinion that Plaintiff would miss work more than three days each month and be off task more than 20% of the time was "totally inconsistent with his own treatment notes where he described the claimant as having moderate symptoms with a GAF score of 60."[11] (AR 31-32.) Dr. Arsenault assigned Plaintiff a GAF of 60 at every single appointment. (AR 405, 412, 1640, 1635, 988, 982, 978, 1612, 1607, 1602, 1597, 1591, 1585, 1579, 1565.) A GAF between 61 and 70 reflects mild symptoms and a GAF between 51 and 60 reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV 32-34 (4th ed., 1994). Thus, a GAF score of 60 is not indicative of severe issues. Furthermore, as the ALJ also pointed out, Plaintiff's "mental status exams were generally unremarkable aside from a depressed and anxious mood." (AR 26.) There were sporadic instances of anxious attitude, depressed or anxious mood, constricted or flat affect, preoccupied thought content, pressured speech, and preoccupied thought content. (*Id.*) But at every appointment with Dr. Arsenault, Plaintiff's mental status exam was normal in appearance, build, posture, eye contact, activity, perception, cognition, intelligence, insight, and judgement with no

---

[11] Although the ALJ stated here that Dr. Arsenault found Plaintiff had a "good" prognosis, (AR 32), Dr. Arsenault actually stated that Plaintiff has a "fair" prognosis. (AR 349.) This reason for assigning Dr. Arsenault little weight is invalid.

31

reported hallucinations or delusions. (AR 1640, 1635, 988, 981, 977, 1612, 1606, 1601, 1596, 1590, 1584, 1578, 1565.)

"The more a medical source presents relevant evidence to support a medical opinion," the more weight the ALJ will give that medical opinion. 20 C.F.R. § 404.1527(c)(3). Opinions that are unsupported by treatment notes may be rejected. *See Tonapetyan*, 242 F.3d at 1149. Thus, because of Plaintiff's consistent GAF scores of 60 and largely normal mental status exams, Dr. Arsenault's opinion was inconsistent with the treatment record. As such, the ALJ properly provided a specific and legitimate reason supported by substantial evidence for discounting Dr. Arsenault's opinion.

Second, the additional reason that the ALJ provided for attributing Dr. Arsenault little weight was that Dr. Arsenault's assessments were internally inconsistent. (*See* AR 31-32.) In psychiatric review forms dated May 17, 2016 and November 2, 2016, Dr. Arsenault stated that Plaintiff would miss work more than three days each month and be off task more than 20% of the time. (AR 775, 350.) However, when asked these same questions again on July 30, 2018, Dr. Arsenault stated that he was "unable to assess" how often Plaintiff's impairments would cause absences from work and how often Plaintiff would be off task in the workplace due to her mental health symptoms. (AR 1544-46.) After more than two years of regular and frequent psychotherapy, Dr. Arsenault's opinion of Plaintiff's mental health showed uncertainty at worst and improvement at best. "The more consistent a medical opinion is with the record as a whole," the more weight the ALJ must assign to it. 20 C.F.R. § 404.1527(c)(4). Thus, because the ALJ identified this inconsistency in Dr. Arsenault's opinions, he articulated a specific and legitimate reason supported by substantial evidence for discounting his opinion.

Finally, Dr. Arsenault's opinions in 2016 that Plaintiff would miss work more than three days each month and be off task more than 20% of the workday are exactly the kind of "brief, conclusory, and inadequately supported" medical opinions that the ALJ is permitted to disregard. *See Britton*, 787 F.3d at 1012. Dr. Arsenault simply provided these conclusions and failed to answer detailed questions to support them. For example, Dr.

Arsenault stated that the degree Plaintiff's mental impairments limit her ability to perform work-related activities was "unknown" and failed to answer questions regarding Plaintiff's ability to understand, remember, and carry out job instructions; perform detailed and complex instructions; relate and interact with co-workers and the public; maintain concentration, attention, persistence, and pace; accept instructions from supervisors; maintain regular attendance and perform work activities on a consistent basis; perform work activities without special or additional supervision. (AR 776, 351.) He also stated that the degree of Plaintiff's functional limitations was "unknown" and failed to answer questions about Plaintiff's restriction in activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation. (AR 776, 351.) Thus, because Dr. Arsenault failed to answer any of these detailed questions to support his assertion that Plaintiff would often miss work and often be off task, this lack of explanation supports the ALJ's rejection of his opinion. This is consistent with the statutory "supportability" factor which states that "[t]he better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3).

### ii.   Treating Psychiatrist Edward Navakas, M.D.

Next, Plaintiff argues that the ALJ failed to address Plaintiff's treating psychiatrist's evaluation. Plaintiff stated that Dr. Edward Navakas, M.D., diagnosed her with "severe mental illness; as Sandoval hears voices and has suicidal thoughts." (Doc. No. 16 at 15, quoting AR 1556.) Plaintiff points to a medical record wherein Plaintiff reported hearing voices for the first time and Dr. Navakas noted, "I explain[ed] that we have to treat that potentially serious symptom" and assigned a GAF of 55. (*Id.*) However, Plaintiff mischaracterized Dr. Navakas' notes. He never diagnosed her with "severe" mental illness, only "moderate" depressive disorder. (AR 1552.) Also, Plaintiff never reported suicidal thoughts: "she denies [intent to] harm herself in any way." (AR 1549.) Furthermore, contrary to Plaintiff's assertion, the ALJ did address Dr. Navakas' evaluation in his medical summary—he stated that on August 21, 2018, Plaintiff "had a depressed and irritable mood

with reports of occasional auditory hallucinations." (AR 30.) Although the ALJ noted this instance, he was not required to evaluate and weigh it because it was not a medical opinion.

An ALJ is required to weigh and evaluate medical opinions. *See* 20 C.F.R. § 404.1527. Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [any] impairment(s), including [Plaintiff's] symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and [any] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Although Dr. Navakas told Plaintiff that "we will have to treat that potentially serious symptom," this is not an actual judgement regarding the nature and severity of Plaintiff's impairments. (AR 1556.) Thus, it was not a medical opinion and did not need to be weighed by the ALJ.

Dr. Navakas' assessment of a GAF of 55 is not a medical opinion either. A GAF score is "a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). GAF scores alone do not control determinations of whether a person's mental impairments rise to the level of a disability. *Garrison*, 759 F.3d at 1002 n.4. Thus, the ALJ need not weigh the GAF score.

In conclusion, although Dr. Navakas' treatment notes record Plaintiff's own report of hearing voices and a GAF of 55, they are not medical opinions pursuant to 20 C.F.R. § 404.1527(a)(1) and do not need to be evaluated and weighed as such. The ALJ did not err by not doing so.

## 2.    The ALJ Properly Evaluated Plaintiff's Mental Impairments Using the Special Technique.

### a.    Applicable Law & Standard of Review

In evaluating the severity of mental impairments, the ALJ must follow a "special technique" beginning at step two of the disability determination. 20 C.F.R. § 404.1520a. First, the ALJ must evaluate the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether" she has "medically determinable mental impairment(s)."

19-CV-1477-WVG

*Id.* at § 404.1520a(b)(1). The ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document findings." *Id.*

Second, the ALJ rates the "degree of functional limitation" resulting from the claimant's impairments and records the findings. *Id.* at § 404.1520a(b)(2). This requires the ALJ to consider "all relevant evidence" to determine the extent to which the claimant's impairments interfere with her functional ability. *Id.* at § 404.1520a(c)(1). The ALJ uses a five-point scale to rate four broad functional areas: "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* at § 404.1520a(c)(3). If the degrees of limitation are "none" or "mild," the ALJ will generally conclude that the claimant's mental impairment is not severe. *Id.* at § 404.1520a(d)(1).

To be documented correctly, the ALJ's decision must include a medical history and a specific finding as to the degree of limitation in each of the functional areas. *Id.* at § 404.1520a(e)(4). An ALJ "clearly" meets the documentation requirement by making specific findings as to the four areas of functional limitations; an "ALJ [is] not required to make any more specific findings of the claimant's functional limitations." *Hoopai v. Astrue*, 499 F.3d 1071, 1077-78 (9th Cir. 2007). The ALJ is not required to "document the considerations underlying the findings" in those four areas. *See Keyser v. Comm'r of Soc. Sec.*, 648 F.3d 721, 726 (9th Cir. 2011); *see Hoopai*, 499 F.3d at 1078. Thus, a specific finding as to the four functional limitations with nothing more is sufficient to document application of the technique. *See Keyser*, 648 F.3d at 726.

### b.   Analysis

Plaintiff argues that the ALJ should have elaborated on and explained his findings as to the four broad functional areas in 20 C.F.R. § 404.1520a(c)(3). (Doc. No. 16 at 16-18.) However, this is contrary to the plain text of the statute and the holdings of *Hoopai* and *Keyser*. The ALJ clearly met the requirements of 20 C.F.R. § 404.1520a(e)(4) by making explicit findings as to each of the four functional areas. The ALJ stated:

> The first functional area is understanding, remembering, or applying information. In this area, the claimant has a mild limitation. The next functional area is interacting with others. In this area, claimant has a mild limitation. The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation.

(AR 26.) The ALJ is not required to document the reasons underlying these findings or make any more specific findings regarding the claimant's functional limitations. *See Hoopai*, 499 F.3d at 1078; *Keyser*, 648 F.3d at 726. The court rejected such an "extensive requirement," concluding that a specific finding as to the four functional limitations was sufficient. *Keyser*, 648 F.3d at 726. Thus, the ALJ adequately documented the special technique for evaluating mental impairments.

Furthermore, the ALJ relied on sufficient evidence in making these determinations and documentations. Plaintiff asserts that the ALJ did not use or reference to medical or non-medical reports when evaluating her mental limitations and thus substituted his own opinion for that of Plaintiff's treating physicians. (Doc. No. 16 at 18.) Plaintiff cites to Social Security Ruling 85-16, which states that "it is the responsibility of the . . . ALJ . . . to identify the pertinent evidence from medical and nonmedical reports and to make findings as to the individual's ability to perform work-related activities." SSR 85-16, 1985 SSR LEXIS 18, *5.

In his decision, the ALJ found that Plaintiff's medically determinable mental impairments "do not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and are therefore nonsevere." (AR 25.) In making this finding, the ALJ stated that Plaintiff "has no history of inpatient psychiatric hospitalization," had "non-emergent and limited treatment for mental health including medications and therapy," and Plaintiff's "mental status exams were generally unremarkable aside from a depressed and anxious mood." (AR 26.) Furthermore, the ALJ relied on two separate medical opinions in drawing his conclusion. After evaluating Plaintiff's mental records, Dr. Brady Dalton, Psy.D. and Dr. Celine Payne-Gair, Ph.D. both concluded that Plaintiff

did not have more than mild limitations. (AR 121, 139.) The ALJ accorded both doctors full weight and stated that their findings were "fully consistent with the objective treatment records that show the claimant had a depressed and anxious mood, but she mostly had otherwise intact mental status exams and GAF scores of 60 that showed moderate and nearly mild mental symptoms." (AR 31.) Thus, Plaintiff's argument that the ALJ did not rely on medical or nonmedical evidence to make his mental determination is without merit.

### 3. Conclusion

The ALJ properly assessed Plaintiff's mental impairments. First, the ALJ did not err in giving Dr. Arsenault's opinion little weight. The ALJ set forth specific, legitimate reasons for rejecting Dr. Arsenault's opinion by detailing inconsistencies between the opinion and the treatment record and noting internal inconsistencies. Second, the ALJ properly performed and documented the special technique for evaluating mental impairments by making specific findings as to the four functional limitations.

## B. The ALJ Improperly Discounted Plaintiff's Subjective Complaints of Pain Without Offering Specific, Clear, and Convincing Reasons.

Plaintiff alleges that the ALJ improperly discounted her statements as to her pain without clear and convincing reasons. Defendant contends that the ALJ properly assessed Plaintiff's subjective pain statements. The Court agrees with Plaintiff for the reasons set forth below.

### 1. Applicable Law & Standard of Review

In assessing the credibility of a claimant's testimony regarding pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted). First, the ALJ must determine whether the claimant has presented "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain." *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, once the claimant has produced medical evidence of an underlying impairment which is reasonably likely to be the cause of the alleged pain and there is no evidence of malingering, the ALJ may reject the claimant's testimony about

the severity of the symptoms only by offering "specific, clear and convincing reasons" for doing so. *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). The clear and convincing standard is the "most demanding" standard and is not an easy requirement to meet. *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). An ALJ must be sufficiently specific to ensure that he did not "arbitrarily discredit" a claimant's subjective testimony. *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (citation omitted).

At the same time, an ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be "available for the asking." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also* 42 U.S.C. § 423(d)(5)(a) (congress expressly prohibits granting disability benefits based on subjective complaints alone).

In evaluating the claimant's credibility, the ALJ may also consider the following factors: daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side effects of any medication; treatment other than medication; functional restrictions; and unexplained failure to seek treatment or to follow a prescribed course of treatment. *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (quoting SSR 88-13, 1988 SSR LEXIS 14, *7-8).

### 2.    Analysis

At step one, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (AR 28.) At step two, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 28.) The ALJ did not find that Plaintiff was malingering, nor did any of the presented evidence suggest that she was doing so.

In order to permit meaningful judicial review, the ALJ must at a minimum "specify which testimony [he] finds not credible." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015); *see also Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) (noting

that "the ALJ must specifically identify the testimony she or he finds not to be credible.") The Ninth Circuit found that the ALJ in *Brown-Hunter* erred when making only the "conclusory statement" that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." *Brown-Hunter*, 806 F.3d at 493. This is the same statement that the ALJ here used in reference to Plaintiff's allegations of disabling pain: "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 28.) This generalized and conclusory statement failed to identify the specific statements that the ALJ found unworthy of belief and thus did not provide the basic information necessary to ensure meaningful judicial review. As such, the ALJ's failure to specify the exact testimony he found not credible was in error.

Even setting this error aside, the two reasons asserted by the ALJ in support of his credibility determination do not meet the demanding "clear and convincing" standard.

### a.  Plaintiff's Daily Activities Are Not Legally Sufficient Grounds for the ALJ's Adverse Credibility Determination.

### i.  Applicable Law & Standard of Review

An ALJ is permitted to consider daily living activities in his credibility analysis. *Burch*, 400 F.3d at 681. In evaluating the credibility of Plaintiff's testimony in regard to her daily activities, the issue is "whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Molina*, 674 F.3d at 1112 (quoting *Lingenfelter*, 504 F.3d at 1040). A claimant's daily activities may be grounds for an adverse credibility finding if a claimant is able to spend a "substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Fair*, 885 F.2d at 603).

Certain activities that involve many of the same physical tasks as working may bolster a finding of non-credibility. *See Fair*, 885 F.2d at 603. However, the law does not require that claimants be "utterly incapacitated" to be eligible for benefits. *Id.* The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that

19-CV-1477-WVG

daily activities are inconsistent with testimony about pain." *Garrison*, 759 F.3d at 1016; *see also Smolen*, 80 F.3d at 1284 n.7 (noting that "many home activities may not be easily transferable to a work environment where it may be impossible to rest periodically or take medication.") As such, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

### ii.    Analysis

Here, the first reason for rejecting Plaintiff's testimony the ALJ offered was:

> Despite these assertions of disability, the claimant acknowledged that she was able to do a variety of daily activities, whereby she could shave; she could ride in a car; she could drive a car only when she needed to; she could go to doctor appointments; she could pay bills and count change and handle a savings account. (B2E, pp.2-9.) The claimant's ability to participate in such activities undermined the consistency of her allegations of disabling functional limitations. Some of the physical and mental abilities required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.

(AR 28.) As an initial matter, Plaintiff actually indicated that she could *not* shave by herself. (AR 271.) As such, this activity cited by the ALJ is erroneous. Plaintiff indicated that her daughter helps her get dressed, helps her into the shower, brushes her hair, shaves her, and wipes her after a bowel movement. (*Id.*) She stated that she does not prepare her own meals, does not shop, does no yard or housework, and only leaves her home for doctor's appointments. (AR 273.)

Moreover, Plaintiff's activities of riding in a car, driving a car only when needed, and going to doctor's appointments do not rise to the level of transferable skills taking up a substantial part of her day. The Ninth Circuit has held that an ALJ's finding that the "capacity to engage in periodic restricted travel" undermines a claimant's pain testimony "trivializes the importance that [the court] consistently [has] ascribed to pain testimony." *Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986); *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[T]he mere fact that plaintiff has carried on certain daily

activities, such as . . . driving a car . . . does not in any way detract from her credibility as to her overall disability."). As such, Plaintiff's activities of riding in a car, occasionally driving a car, and attending doctor's appointments are not legally sufficient reasons for attributing her pain testimony little weight.

Plaintiff's only activities that may be somewhat transferable to a work setting are paying bills, counting change, and handling a savings account. However, Plaintiff stated on various occasions, "I don't have any money" and "I have no money, I can't even support my 19-year-old." (AR 9, 79.) Thus, there is neither proof that Plaintiff spent a "substantial" part of her day engaged in handling her money nor evidence to support that Plaintiff's handling of her money was "transferable" to a work setting. *See Orn*, 495 F.3d at 639.

In conclusion, Plaintiff's reported daily activities provide no reason to doubt the credibility of her testimony because they do not rise to the level of transferable activities taking up a substantial part of her day.

### b.    Lack of Objective Medical Evidence Is Not a Legally Sufficient Ground for the ALJ's Adverse Credibility Determination.

Next, the ALJ stated that Plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 29.) After providing a summary of Plaintiff's medical history, the ALJ stated:

> The consistency of the claimant's allegations regarding the severity of her symptoms and limitations is diminished because those allegations are greater than expected in light of the objective evidence of record. The positive objective clinical and diagnostic findings since the alleged onset date detailed above do not support more restrictive functional limitations than those assessed herein.

(AR 30.)

### i.    Applicable Law & Standard of Review

Although lack of medical evidence is a factor that the ALJ can consider in his credibility analysis, this lack alone "cannot form the sole basis for discounting pain

41

testimony." *Burch*, 400 F.3d at 68; *see also* 20 C.F.R. § 416.929(c)(2) (an ALJ cannot reject statements about the "intensity and persistence of [Plaintiff's] pain . . . solely because the available objective medical evidence does not substantiate [Plaintiff's] statements."). The claimant is not required to produce medical findings that support the severity of pain. *Bunnell*, 947 F.2d at 343.

### ii.    Analysis

Because the ALJ's reliance on Plaintiff's daily activities is not a legally sufficient reason for discrediting her pain, the lack of objective medical evidence to support Plaintiff's statements of pain by itself cannot on its own form the basis for discounting her testimony.

Furthermore, even if lack of medical evidence alone *could* form the basis for discounting Plaintiff's symptoms, contrary to the ALJ's assertion, the record contains documentation of objective medical findings supporting Plaintiff's allegations of pain. For example, an x-ray of Plaintiff's thoracolumbar spine on November 2, 2016 revealed minimal scoliosis with minimal multilevel spondylosis thoracic spine and moderate degenerative disc disease at L5-S1. (AR 1056.) In addition, an MRI of Plaintiff's lumbar spine dated December 7, 2016 showed multilevel spondylosis and severe disc desiccation and loss in height at L5-S1 with chronic degenerative endplate changes anteriorly. (AR 886.) At L5-S1, there was severe disc desiccation with trace bulging and ridge of osteophytes. (*Id.*) Finally, an x-ray of the lumbar spine dated March 8, 2018 revealed mild scoliosis, degenerative changes at L5-S1, and moderately severe degenerative disc disease at L5-S1 with disc space narrowing and endplate sclerosis. (AR 2140.) Plaintiff's treating physician Dr. Brian Snook indicated that he relied on Plaintiff's MRIs and x-rays in evaluating Plaintiff's ability to work. (*See* AR 1537-38, 879-80.)

As Defendant indicated, an ALJ is permitted to consider all available evidence—including medical opinions—in evaluating the intensity and persistence of a claimant's symptoms. 20 C.F.R. § 416.929(c)(1). Here, one examining and two non-examining physicians opined that Plaintiff is not disabled and Plaintiff's treating physician opined that

19-CV-1477-WVG

Plaintiff is disabled. (*See* AR 871-72, 123-24, 141-42, 879-80, 1537-40, 46, 951.) However, the ALJ did not indicate that he relied on non-examining physician opinions in discounting Plaintiff's subjective statements as to her pain. The Court is confined to reviewing only the reasons stated by the ALJ. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ-not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). Thus, although the record contains evidence that could support the ALJ's opinion, the ALJ's failure to cite that evidence precludes the Court from finding there was no error.

### 3.    Conclusion

Because an ALJ is not permitted to rely on a lack of medical evidence that substantiates claims of pain alone and the ALJ's reliance on Plaintiff's daily activities was erroneous, the ALJ had no legally sufficient grounds for rejecting Plaintiff's pain testimony. This error was not harmless. An error is harmless only if it is "inconsequential to the ultimate nondisability determination" or the agency's path may reasonably be discerned. *Brown-Hunter*, 806 F.3d at 494 (quoting *Molina*, 674 F.3d at 1115). Here, the ALJ failed to identify which testimony he found not credible and failed to provide clear and convincing reasons for finding Plaintiff's symptom testimony not credible.

## C. Remand for Further Administrative Proceedings is the Proper Remedy.

Plaintiff believes that because she has provided pain severity testimony that is supported by the medical reports of her treating physician, this Court should take her testimony to be established as true and remand for an award of benefits. For the following reasons, this Court finds that Plaintiff's application of the credit-as-true standard is misguided and that remand for additional administrative proceedings is the proper remedy.

### 1.    Applicable Law & Standard of Review

The Ninth Circuit has held that "[a] district court may reverse the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing, but

the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2016) (quotations omitted). The credit-as-true doctrine, if applicable, would require the Court to remand the matter to the agency for an immediate award of benefits. *See Garrison*, 759 F.3d at 1019. This doctrine applies only when: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id.* at 1020. Even if these requirements are met, the court retains "flexibility" to "remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

### 2.   Analysis

Here, even though the Court finds that the ALJ committed legal error by failing to specify which testimony he found not credible and why, the Court will not remand for an immediate award of benefits because the Court is not satisfied that further administrative proceedings would serve no useful purpose.

Plaintiff asks the Court to remand for an award of benefits because she has "provided testimony which has not been contradicted." (Doc. No. 16 at 21.) However, this statement is erroneous. One examining doctor and two non-examining doctors concluded that Plaintiff is not disabled, and their opinions contradicted the degree of the limitations Plaintiff alleged. (*See* AR 871, 123-24, 141-42.)

Even if all the requirements of the credit-as-true doctrine were met, an evaluation of the record as a whole creates serious doubt that Plaintiff is, in fact, disabled. For example, on March 25, 2017 a physical exam revealed a normal range of motion in the back. (AR 1234.) However, on March 30, 2017, a physical exam revealed decreased lumbar range of motion secondary to pain. (AR 1805.) Furthermore, on September 14, 2017, Plaintiff went to Urgent Care complaining of moderate-severe, persistent back pain. (AR 2388.)

However, on November 13, 2017, Plaintiff denied back, neck, and joint pain and her physical exam revealed normal findings. (*See* AR 2370, 2371.)

On June 9, 2016, a physical exam revealed that Plaintiff had no back tenderness, normal range of motion in the lower extremities, and non-tender lower extremities. (AR 1282.) However, during an examination by Dr. Thomas Sabourin, M.D. on August 25, 2016, Plaintiff refused to get on the examination table and complained of "severe pain with any motion." (AR 867, 869.) These conflicting medical records give the Court reason to doubt that Plaintiff has been entirely incapable of work since April 29, 2016.

Accordingly, the Court is unable to conclude that the record is "free from conflicts, ambiguities [and] gaps" and that Plaintiff's "entitlement to benefits is clear." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103-04 (9th Cir. 2014). Remand for further proceedings is therefore appropriate.

**D.   Plaintiff is Entitled to Summary Judgment.**

Based on the foregoing, Plaintiff's Motion for Summary Judgement is GRANTED-IN-PART and Defendant's Cross-Motion for Summary Judgement is DENIED-IN-PART.

**V.   CONCLUSION**

Based on the foregoing, Plaintiff's Motion for Summary Judgement is GRANTED-IN-PART and Defendant's Cross-Motion for Summary Judgement is DENIED-IN-PART.

The Court orders the matter be remanded to the ALJ for further proceedings consistent with this Order.

The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

DATED: July 28, 2020

_____
Hon. William V. Gallo
United States Magistrate Judge

19-CV-1477-WVG